1   WO

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                          FOR THE DISTRICT OF ARIZONA

8

9   James Skinner,                              No.  CV 12-1729-PHX-SMM (ESW)

10                     Plaintiff,

11       vs.                                        **O R D E R**

12   Charles L. Ryan, et al.

13                     Defendants.

14

15          Plaintiff James Skinner brought this civil rights action under 42 U.S.C. § 1983

16   against multiple Arizona Department of Corrections (ADC) employees (Doc. 8).  Before

17   the Court is Defendants' Motion for Summary Judgment (Doc. 176).

18          The Court will grant the motion.

19   **I.    Background**

20          Skinner's claims arose during his confinement in two different housing units: the

21   Arizona State Prison Complex (ASPC)-Florence, Central Unit and the ASPC-Eyman,

22   Browning Unit (Doc. 8).  Skinner alleged that while housed in these two units, he was

23   subjected to unconstitutional conditions of confinement in violation of the Eighth

24   Amendment (*id.*).  He named the following Defendants: (1) Director Charles L. Ryan;

25   (2) Warden Lance Hetmer; Deputy Wardens (3) Craig Fizer and (4) Antonio Barrios, Jr.;

26   Assistant Deputy Wardens (5) Thomas Kane and (6) Jack Heet; (7) Captain James Long;

27   Sergeants (8) Jacqueline Silves and (9) Frank Alvarez; Correctional Officer (CO) IVs

28

1  (10) Susan Zaborsky and (11) Diane Bohuszewicz; (12) CO III Rita Duarte;[1] and CO IIs

2  (13) Tillman and (14) Trianna (*id.*).

3        Defendants move for summary judgment on the grounds that (1) Skinner failed to

4  exhaust administrative remedies for his claim related to his confinement in the Central

5  Unit; (2) no Defendant acted with deliberate indifference; and (3) Defendants cannot be

6  liable due to inadequate funding (Doc. 176).[2]

7  **II.    Summary Judgment Legal Standard**

8        A court must grant summary judgment "if the movant shows that there is no

9  genuine dispute as to any material fact and the movant is entitled to judgment as a matter

10  of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

11  (1986).  The movant bears the initial responsibility of presenting the basis for its motion

12  and identifying those portions of the record, together with affidavits, if any, that it

13  believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at

14  323.

15        If the movant fails to carry its initial burden of production, the nonmovant need

16  not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d

17  burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that

18  the fact in contention is material, i.e., a fact that might affect the outcome of the suit

19  under the governing law, and that the dispute is genuine, i.e., the evidence is such that a

20  reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*,

21  *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d

22  1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact

23  conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-

24

25      [1] Duarte has not yet been served.  The Court extended the time for service of

26  process for Duarte until June 26, 2015 (Doc. 196).

27      [2] The Court issued the Notice required under *Rand v. Rowland*, 154 F.3d 952, 960

28  (9th Cir. 1998) (en banc), which notified Skinner of Federal Rule of Civil Procedure 56
and the requirements to oppose summary judgment (Doc. 178).  Shortly thereafter,
Skinner obtained counsel (Doc. 179).

89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III.    Relevant Facts

On January 16, 2011, Skinner was moved to Central Unit Cell Block 3 (CB-3) and housed in Charlie run, cell 16, referred to as C-16 (Doc. 177, Defs.' Statement of Facts (DSOF)[3] ¶¶ 2-3; Doc. 185, Pl.'s Controverting Statement of Facts (PCSF) ¶¶ 2-3). Upon his placement in C-16, Skinner complained to unidentified staff that the toilet leaked and the cell was dirty (DSOF ¶ 4; PCSF ¶ 4). Skinner avers that the toilet was visibly cracked and a foul odor came from the toilet (Doc. 185, Ex. A, Skinner Decl. ¶¶ 16, 18).[4] Skinner states that when the toilet was flushed, it would leak dirty wastewater from the base onto the floor, and he noted the toilet problem on the cell inspection sheet, which he signed

---

[3] Local Rule of Civil Procedure 56.1(a) states that the separate statement of facts should include only those facts necessary to decide the motion; "[o]ther undisputed facts (such as those providing background about the action or the parties) may be included in the memorandum of law, but should not be included in the separate statement of facts." DSOF consists of 303 paragraphs and includes background facts, facts about the parties, arguments, and many irrelevant/immaterial facts that are unhelpful or should have been included only in the memorandum (*see* Doc. 177). This made the Court's task much more burdensome, thereby defeating the purpose of Local Rule 56.1(a). Defense counsel is reminded of his obligation to comply with the Federal and Local Rules of Civil Procedure. *See* LRCiv 83.1(f)(1)(A).

[4] Defendants assert generally that Skinner's declaration is unsupported; however, they do not set forth any specific objections to any paragraph within the declaration (Doc. 188 at 6). Skinner's declaration is signed under penalty of perjury and, to the extent he sets out facts for which he has personal knowledge and that would be admissible in evidence, the Court considers his declaration in opposition to summary judgment. *See* Fed. R. Civ. P. 56(c)(4).

and handed to the escort staff (*id.* ¶¶ 20, 22; Doc. 185, Pl.'s Separate Statement of Facts (PSOF) ¶¶ 14-15).  Skinner avers that he asked for a mop but the escort staff refused his request and did not give him cleaning supplies and, thereafter, the toilet leaked incessantly and he had to keep the lid down to help manage the constant stench (Doc. 185, Ex. A, Skinner Decl. ¶¶ 9, 11, 24-26).  He further averred that when the toilet in the cell above him was flushed, water would drip into his cell, adding to the flooding problem (*id.* ¶ 29).  Skinner states that escort staff told him a work order existed for the toilet plumbing issue (*id.* ¶ 10).

Skinner states that about a week after moving into C-16, he asked CO II McBroom about the status of the work orders; McBroom informed him that a work order was placed on the toilet already and that the problem existed long before Skinner moved into the cell (*id.* ¶¶ 35-36).  Skinner states that a few weeks later, an ADC maintenance worker stopped by his cell and told Skinner he was aware of the toilet's problem, the seal was broken, and repair was not possible short of a complete replacement but the administration refused to pay to replace toilets due to the cost (*id.* ¶ 38).[5]

On July 28, 2011, Skinner was moved to CB-2, cell G-24 (DSOF ¶ 29 (in part)[6]; Doc. 185, Ex. A, Skinner Decl. ¶¶ 62-63).  Skinner avers that he was moved pursuant to his approval for the Central Unit Phase Program (Doc. 185, Ex. A, Pl. Decl. ¶¶ 62-63).  He states that G-24 had structural defects including a large wall crack and a hot water button that would not disengage without staff intervention (*id.* ¶ 64).  Skinner states that the CB-2 staff informed him that a work order would be placed on the sink (*id.* ¶ 65).

---

[5] Skinner also asserts facts about alleged unsanitary conditions of the recreation cages for CB-3 and the walkway in front of the cages (PSOF ¶¶ 42-43, 47, 53).  The Court's Screening Order did not recognize a separate claim pertaining to the conditions of the recreation cages or walkways (Doc. 9 at 14).

[6] Defendants state that on July 28, 2011, Skinner was moved for one day while maintenance staff tried to fix the toilet in C-16 (DSOF ¶ 29).  But there is no citation to admissible evidence, and, notably, there is no work order for July 28, 2011, to support that this was the reason for Skinner's move or that maintenance worked on the toilet in C-16 that day (*id.*; *see* Doc. 177-3 at 37-65)).  Nor do Defendants dispute Skinner's assertion that he was moved pursuant to his approval for the Phase Program (*see* Doc. 188).

According to Skinner, during the next shift, he was brought to the yard office where Qunitero informed him that he was being removed from the Phase Program and returned to C-16 in CB-3 (*id.* ¶¶ 67-68).  Upon his return to C-16, the cell was just as he had left it and there had been no repair work on the toilet (*id.* ¶ 71).

Skinner states that between January 16 and October 19, 2011, he made many requests for status on the toilet work orders and repeatedly asked for adequate cleaning supplies to address the sanitation problems (*id.* ¶¶ 72-73).  During this time, CO III Duarte was Skinner's assigned counselor and was the initial contact point for non-security issues (DSOF ¶¶ 34-35).

Defendants state that around May or June 2011, Skinner informed Duarte of the toilet problems (*id.* ¶ 40).  Defendants state that Durate told Skinner she would attempt to get him moved to another cell but Skinner responded that it was not that bad and he did not want to take a chance on moving to a cell that might be worse (*id.* ¶ 41).  Defendants state that despite Skinner's response, Duarte requested that Skinner be moved out of C-16 (*id.* ¶ 42).

Skinner disputes these facts; he avers that shortly after he first arrived at C-16—well before May or June 2011—he met Duarte and showed her the toilet problems (Doc. 185, Ex. A, Pl. Decl. ¶¶ 74-75).  Skinner states that Duarte never asked him if he wanted to be moved to another cell nor did Durate tell him that she would attempt to have him moved (*id.* ¶¶ 76-77).  He further states that he never told Duarte that the problem was not that bad or that he did not want to take a chance moving to another cell that might be worse (*id.* ¶ 78).  Skinner states that Duarte told him this was a maintenance issue that was common and he needed to have patience (*id.* ¶¶ 85-86).

According to Skinner, in mid-to-late March 2011, CO IV Zaborsky toured Skinner's run in CB-3 along with Duarte, and Skinner stopped them to show how the toilet was leaking (*id.* ¶¶ 88-89).  Skinner states he told them that he needed adequate sanitation supplies and that he was missing the hot water plumbing apparatus (*id.* ¶¶ 90-

91).  Skinner states that 1-2 weeks later, the sink was fixed but no repair work was done on the toilet (*id.* ¶ 94).

Skinner states that he also showed the toilet problems to Sergeant Silves, CO IV Bohuszewicz, and Deputy Warden Kane, and asked them for appropriate cleaning supplies, which they never provided (*id.* ¶¶ 95-96, 101).  Skinner states that Silves told him she knew about the problems but she had other work; Bohuszewicz told him that ADC was aware of the plumbing issues but was broke; and Kane told him that he and Wardens Fizer and Hetmer knew about the irreparable toilet problems and Skinner should be patient (*id.* ¶¶ 97, 99-100).

On August 2, 2011, Skinner submitted an Inmate Letter to Duarte describing the leaky toilet, flooding problems, and lack of cleaning supplies and proposing as a resolution that the toilet be fixed or repaired and cleaning supplies be provided (*id.* ¶ 102; DSOF ¶ 47; Doc. 177, Ex. J, Attach. 1 (Doc. 177-9 at 10)).  In response to Skinner's Inmate Letter, Duarte informed Skinner that maintenance has a list of toilets they are working on; that she submitted another work order for Skinner's toilet; and that she would follow up with maintenance the next week and let him know the status of the toilet repair (*id* ¶¶ 48-50, 53 (in part); PCSF ¶ 50).

On August 21, 2011, Skinner submitted an inmate grievance complaining about the conditions in his cell and lack of cleaning supplies (DSOF ¶ 77).  Bohuszewicz received the grievance and checked with maintenance to make sure that department was aware of the complaint (*id.* ¶ 78).  Defendants state that Bohuszewicz did not personally go to Skinner's cell to verify his allegations (DSOF ¶ 79); however, Skinner avers that he showed the toilet problems to Bohuszewicz and asked her for cleaning supplies (Doc. 185, Ex. A, Pl. Decl. ¶¶ 95-96).  After Bohuszewicz's investigation and input from Deputy Warden Fizer, it was determined that the toilet could not be repaired or replaced at that time (DSOF ¶ 80).

On October 19, 2011, Skinner was moved from C-16 to Baker Run, cell 17 (DSOF ¶¶ 86, 181-182).

1

### B.    Browning Unit

On December 6, 2011, Skinner was moved to the Browning Unit, cell 1-B-3 (Doc. 185, Pl. Decl. ¶ 108).  Skinner avers that upon his arrival to 1-B-3, the cell was filthy and smelled awful and on the walls there were smears of what appeared to be blood and feces (*id.* ¶¶ 110-113).  He states that there was dried phlegm and other grime on the cell front, the floor was grimy, a section of the plumbing wall was rusted off, and the toilet was filthy (*id.* ¶¶ 114-116).  Skinner was offered a toilet brush by CO II Trianna but Skinner's requests for a broom, mop, mop bucket, scrub brush, rag, and disinfectant were denied (*id.* ¶¶ 119-121).  Skinner states that Trianna told him he had to take care of the other cell issues himself (*id.* ¶ 122).

Skinner states that later that day, CO III Monahan provided him a short-handled broom and mop; however, the mop was ineffective on the cell walls (*id.* ¶¶ 126, 129-130).  Skinner states that thereafter, he was offered only a toilet brush, and Trianna informed him that the only cleaning supply ever passed out was a toilet brush, although there were other cleaning supplies available in the cluster supply closet (*id.* ¶¶ 132-133).

In January 2012, Skinner filed a grievance to complain about the conditions in 1-B-3 and lack of cleaning supplies (*id.* ¶ 136).  On January 24, 2012, CO III Fewel entered the pod and passed out all of the necessary cleaning supplies (*id.* ¶ 147).  Skinner states that he nonetheless proceeded with his grievance and, on February 22, 2012, Sergeant Alvarez came to Skinner's cell (*id.* ¶¶ 156-157).  According to Skinner, Alvarez said he was notified that staff was not passing out all of the cleaning supplies and that he would return later in the week to supervise distribution of cleaning supplies (*id.* ¶ 158).  Alvarez avers that he does not recall talking to Skinner on this date (DSOF ¶ 238).  Skinner states that Alvarez did not return and no cleaning supplies were issued (Doc. 185, Pl. Decl. ¶ 160).

Skinner avers that on March 19, 2012, after he had filed his grievance appeal, Associate Deputy Warden Heet and CO IV Ibarra came to his cell (*id.* ¶¶ 159, 161).  According to Skinner, Heet admitted he was aware that cleaning supplies were not being

properly handed out and he promised to have all cleaning supplies delivered on each scheduled cleaning day (*id.* ¶¶ 164, 168).  Skinner states that this promise was not kept (*id.* ¶ 169).  Heet states that he became aware of Skinner's complaint in April, not March 2012, and that he spoke to Skinner on April 19, 2012 and informed him there was a plan in place to ensure his sanitation needs were met (DSOF ¶¶ 266-267).

Skinner avers that on April 18, 2012, CO II Tillman refused to pass out all of the cleaning supplies, even though he told her about the conversations with Heet and Fewel; Tillman told him she only passes out toilet brushes (*id.* ¶¶ 172-173).  Skinner states that Alvarez then arrived at his cell, confirmed that he was Tillman's supervisor, but refused to provide or authorize the delivery of cleaning supplies (*id.* ¶¶ 179, 182-184, 187-188).

On May 31, 2012, Skinner was moved to Able 55, an area that houses severely mentally ill (SMI) inmates; however, Skinner has no history of mental illness (*id.* ¶¶ 191-193).  On June 9, 2012, an SMI inmate flooded the entire run, and feces and sewage water flooded Skinner's cell (*id.* ¶¶ 194-195, 199).  Skinner states that he asked Sergeant Soliz for a mop and disinfectant, but Soliz denied his requests and no cleaning supplies were provided, and other staff members told the affected inmates to use their blankets to dry up the flooding (*id.* ¶¶ 200-201, 204).  Skinner notified Deputy Warden Barrios of the problems in a June 12, 2012 Inmate Letter (*id.* ¶ 205).

The next month, Skinner was moved to cell 2-F-51, and he continued to deal with the staff's refusal to pass out anything other than a toilet brush (*id.* ¶ 206-207).

## IV.   Exhaustion

### A.   Legal Standard

Under the Prisoner Litigation Reform Act (PLRA), a prisoner must exhaust "available" administrative remedies before filing an action in federal court.  *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005).   The prisoner must complete the administrative review process in accordance with the applicable rules.  *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006).  Exhaustion is required for all suits about prison life, *Porter*

1   *v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the

2   administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

3         The defendant bears the initial burden to show that there was an available

4   administrative remedy and that the prisoner did not exhaust it.  *Albino v. Baca*, 747 F.3d

5   1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936-37 (a defendant must

6   demonstrate that applicable relief remained available in the grievance process).  Once

7   that showing is made, the burden shifts to the prisoner, who must either demonstrate that

8   he, in fact, exhausted administrative remedies or "come forward with evidence showing

9   that there is something in his particular case that made the existing and generally

10   available administrative remedies effectively unavailable to him."  *Albino*, 747 F.3d at

11   1172.  The ultimate burden, however, rests with the defendant.  *Id.*  Summary judgment is

12   appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner,

13   shows a failure to exhaust.  *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

14         If summary judgment is denied, disputed factual questions relevant to exhaustion

15   should be decided by the judge; a plaintiff is not entitled to a jury trial on the issue of

16   exhaustion.  *Albino*, 747 F.3d at 1170-71.  But if a court finds that the prisoner exhausted

17   administrative remedies, that administrative remedies were not available, or that the

18   failure to exhaust administrative remedies should be excused, the case proceeds to the

19   merits.  *Id.* at 1171.

20         **B.**    **ADC Grievance Procedure**

21         The ADC grievance procedure is set forth in ADC Department Order (DO) 802,

22   Inmate Grievance Procedure (Doc. 177, Ex. I, Attach. 1).   An inmate initiates the

23   grievance process by submitting an Inmate Letter to his assigned CO III (*id.*; *see* DSOF

24   ¶ 20).  If not satisfied with the CO III's response, within five work days of receipt of the

25   response, the inmate may submit a formal inmate grievance to the Grievance Coordinator

26   (Doc. 177, Ex. I, Attach. 1; *see* DSOF ¶ 21).   If the inmate receives an unfavorable

27   response, within five work days of receipt of the response, the inmate may submit an

28   appeal to the Warden (*id.*).  Finally, if the inmate seeks to appeal the Warden's response,

1   within five work days of receipt of the response, he may submit an appeal to the Director

2   via the Grievance Coordinator (*id.*).   The Director's response is final (Doc. 177, Ex. I,

3   Attach. 1; *see* DSOF ¶ 22).

4       **C.    Discussion**

5       The record shows that on August 2, 2011, Skinner filed an Inmate Letter

6   complaining about conditions of his confinement in C-16 and the lack of cleaning

7   supplies, thereby completing the first step in the grievance process (DSOF ¶ 47).

8       Duarte responded to this Inmate Letter on August 18, 2011 (*id.* ¶ 50).   On August

9   21, 2011—within five work days of Duarte's response—Skinner submitted an inmate

10  grievance; thus, he completed the second step of the process (*id.* ¶ 54).

11      Defendants explain that on October 19, 2011, Deputy Warden Fizer responded to

12  Skinner's inmate grievance and relocated him to cell B-17 (DSOF ¶¶ 181-182; Doc. 176

13  at 3).[7]   Skinner does not allege that there were any problems with the conditions in B-17

14  (*see* Doc. 185, Ex. A, Pl. Decl. ¶¶ 103-107).   Thus, by transferring Skinner from C-16 to

15  B-17, Fizer effectively provided the relief that Skinner was seeking; that is, to no longer

16  be subjected to unsanitary conditions of confinement.   The Ninth Circuit has expressly

17  held that "a prisoner need not press on to exhaust further levels of review once he has [ ]

18  received all 'available' remedies at an intermediate level of review . . . ."   *Brown*, 422

19  F.3d at 935.   The Court finds that because his grievance complaint was remedied by the

20  transfer to B-17, under *Brown*, Skinner was not required to appeal his grievance to higher

21  levels and remedies were exhausted.

22      Nonetheless, Skinner proceeded with the grievance process and, on October 21,

23  2011, within five work days of receipt of Fizer's response, Skinner submitted a grievance

24  _____

25      [7] In a footnote in their reply, Defendants state that Skinner filed more than one
    complaint per grievance, which is prohibited by the ADC grievance procedure (Doc. 188
26  at 3 n. 5).  But neither Fizer nor any other official rejected or denied Skinner's grievance
    on the ground that it raised more than one complaint (Doc. 177-1 at 29 (Fizer's Oct. 19,
27  2011 grievance resp.)).   Defendants were obligated to inform Skinner if there were any
    deficiencies with his grievances.  *See Brown*, 422 F.3d at 937.  Therefore, the Court will
28  not permit Defendants to go back and attempt to reject Skinner's grievance on procedural
    grounds never raised by prison officials at the time.

1   appeal to the next level.  Accordingly, he completed the third step in the process (DSOF

2   ¶ 215).

3          Hetmer responded to Skinner's grievance appeal on January 19, 2012 (DSOF

4   ¶ 216).  Hetmer's response was routed to the ASPC-Florence Complex, Central Unit, on

5   January 30, 2012; however, by that time, Skinner had already been moved to the

6   Browning Unit (Doc. 185, Ex. A, Pl. Decl. ¶¶ 108 (moved on Dec. 6, 2011), 227-228, Ex.

7   15). Skinner avers that he received Hetmer's response and signed for it on March 16,

8   2012 (*id.* ¶ 229, Ex. 15).  Two days later, on March 18, 2012, Skinner submitted his final

9   appeal to the Director (*id.* ¶ 230; DSOF ¶ 217).   The final appeal was returned

10  unprocessed on the ground that it was untimely (*id*).

11         The parties dispute whether Skinner's March 18, 2012 final appeal constituted

12  proper exhaustion of administrative remedies because it was not submitted within five

13  work days of Hetmer's January 19, 2012 response.

14         Defendants maintain there is no evidence that Hetmer's January 19, 2012 response

15  did not reach Skinner between January 20 and March 15, 2012 (Doc. 188 at 3).   But

16  Skinner avers that he did not receive the response until March 16, 2012 (Doc. 185, Ex. A,

17  Pl. Decl. ¶ 229).  At summary judgment, the Court must take this averment as true.  *See*

18  *Anderson*, 477 U.S. at 255.  Skinner also submits a copy of Hetmer's January 19, 2012

19  response, which on its face shows that it was received on January 30, 2012, at the

20  Florence Complex, where Skinner was no longer housed (Doc. 185, Ex. A, Ex. 15).

21  More importantly, it shows that Skinner initialed and dated the response as received on

22  March 16, 2012 (*id.*).  This evidence is sufficient to establish that Skinner did not receive

23  the response until March 16, 2012.  In reply, Defendants fail to present any evidence to

24  show otherwise.

25         Instead, they contend that even if Skinner did not receive Hetmer's response until

26  March 16, 2012, Skinner's March 18, 2012 final appeal is nonetheless untimely because

27  ADC policy provides that if an inmate does not receive a response from an ADC official

28  within the time limits set in DO 802, the inmate may proceed to the next review level

(Doc. 188 at 3).  Under DO 802, after Skinner submitted his grievance appeal, Hetmer had 20 work days to issue a response to Skinner (Doc. 177, Ex. I, Attach. 1, DO § 802.04, 1.3 (Doc. 177-8 at 25).  Skinner submitted his grievance appeal on October 21, 2011; therefore, Hetmer had until November 18, 2011 to issue the response, and, when there was no response by this date, Skinner could have filed his appeal to the Director (DSOF ¶ 215; Ex. I, Attach. 1, DO § 802.01, 1.11).  But the grievance procedure states only that an inmate is "entitled" to move to the next step; it does not *require* him to move to the next step within five work days of the date the response was due.  Indeed, Hetmer's January 19, 2012 response was issued well beyond the 20 work days the policy provided for a response; yet, Defendants indicate that they would have accepted an appeal filed within five days of Hetmer's late response; "[b]y policy, Skinner had 5 days from January 19, 2012, to appeal to the Director" (DSOF ¶ 217).

The ADC grievance policy specifically states that "[w]ithin five work days *from the date that the inmate received the decision of the Warden* the inmate may elect to appeal the decision of the Warden to the Director" (Doc. 177, Ex. I, Attach. 1, DO § 802.07, 101) (emphasis added).  It further states that "[i]nmates may not file an appeal to the Director until the Grievance Procedure within their assigned unit and institution has been exhausted" (*id.*).  The documentary evidence shows that Skinner received Warden Hetmer's response on March 16, 2012, at which point the Grievance Procedure within his unit and institution was exhausted.  Skinner then filed his appeal to the Director on March 18, 2012, which was within five work days of receiving Hetmer's response.  On this record, Skinner complied with the ADC grievance procedure regulations and properly filed a final appeal to the Director.

In sum, the Court finds that Skinner was not required to continue to appeal his grievance after the Warden transferred him out of C-16 in October 2011.  In the alternative, the Court finds that Skinner properly appealed his grievance through to the final level and exhausted remedies for his claim related to his confinement in CB-3.

1    Defendants' request for summary judgment for failure to exhaust will therefore be
2    denied, and the Court will address the merits of Skinner's claim.

3    **V.      Conditions of Confinement**

4            **A.      Legal Standard**

5            The Eighth Amendment protects prisoners from inhumane conditions of
6    confinement. *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). Prison
7    officials have a duty to ensure that prisoners are provided, among other things, adequate
8    shelter, sanitation, and personal safety. *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir.
9    2000)). Conditions of confinement may be restrictive and harsh; however, they cannot
10   involve the "wanton and unnecessary infliction of pain" or be devoid of a legitimate
11   penological purpose. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

12          Where a prisoner alleges injuries stemming from unsafe conditions of
13   confinement, prison officials may be held liable only if they acted with "deliberate
14   indifference to a substantial risk of serious harm." *Frost v. Agnos*, 152 F.3d 1124, 1128
15   (9th Cir. 1998). The deliberate indifference standard involves an objective and a
16   subjective prong. First, the plaintiff must show that the alleged deprivation was
17   "sufficiently serious" to rise to the level of an Eighth Amendment violation. *Farmer v.
18   Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991));
19   *Johnson*, 217 F.3d at 731. Extreme deprivations are required to support an Eighth
20   Amendment conditions-of-confinement claim. *Hudson v. McMillian*, 503 U.S. 1, 9
21   (1992) (citation omitted). "Only those deprivations denying the minimal civilized
22   measure of life's necessities are sufficiently grave to form the basis of an Eighth
23   Amendment violation." *Id.* (quotations and citations omitted). When determining
24   whether an alleged deprivation is objectively sufficiently serious to support a
25   constitutional claim, a court must consider the circumstances, nature, and duration of a
26   deprivation. *Johnson*, 217 F.3d at 731-32. "The more basic the particular need, the
27   shorter the time it can be withheld." *Hoptowit v. Ray* 682 F.2d 1237, 1259 (9th Cir.
28   1982), *abrogated in part on other grounds by Sandin v. Connor*, 515 U.S. 472 (1995).

1    Second, the plaintiff must show that the prison official acted with a "sufficiently
2    culpable state of mind"; that is, that the official "kn[ew] of and disregarded an excessive
3    risk to inmate health or safety . . . ."  *Farmer*, 511 U.S. at 837; *Thomas v. Ponder*, 611
4    F.3d 1144, 1150 (9th Cir. 2010) ("the inmate must show that the prison officials had no
5    'reasonable' justification for the deprivation").  Thus, a prison official may be held liable
6    under the Eighth Amendment for denying humane conditions of confinement only if he
7    knows that inmates face a substantial risk of harm and disregards that risk by failing to
8    take reasonable measures to abate it.  *Farmer*, 511 U.S. at 837-45.  Mere negligence is
9    insufficient to establish liability; the official's conduct must have been wanton.  *Id.* at
10   835; *Frost*, 152 F.3d at 1128.  Prison officials may avoid liability by presenting evidence
11   that they lacked knowledge of the risk, or by presenting evidence of a reasonable, albeit
12   unsuccessful, response to the risk.  *Farmer*, 511 U.S. at 844-45.

13        **B.    Discussion**
14             **1.    Objective Test**
15        The first step in the deliberate indifference analysis is to determine if Skinner's
16   incarceration in either CB-3 or the Browning Unit deprived him of "the minimal civilized
17   measure of life's necessities."  *Hudson*, 503 U.S. at 9.  It is well-settled that subjecting "a
18   prisoner to lack of sanitation that is severe or prolonged can constitute an infliction of
19   pain within the meaning of the Eighth Amendment."  *Anderson v. Cnty. of Kern*, 45 F.3d
20   1310, 1314 (9th Cir. 1995) (citing cases).

21             **a.    CB-3, Cell 16**
22        Defendants assert that nothing presented by Skinner rises to the level of a
23   deprivation under the Eighth Amendment (Doc. 176 at 20).  Defendants acknowledge
24   that plumbing in CB-3 is old and requires constant attention through maintenance and, at
25   any given time, a number of toilets at the Central Unit leak (DSOF ¶¶ 139-140, 172, 176,
26   218).  But they submit sworn statements to support that the conditions in C-16 did not
27   constitute a serious risk to Skinner's health or safety.  CO III Duarte avers that based on
28   her observations, Skinner's cell always appeared to be clean and there was no noticeable

- 14 -

1    smell (*id ¶* 59).  Bohuszewicz avers that during her weekly walk-throughs, she found

2    Skinner's cell to be generally clean with no noticeable odor and she never saw water

3    leaking from his toilet (*id.* ¶ 91).  And Fizer avers that he never observed Skinner's toilet

4    leaking (*id.* ¶ 176).

5            Skinner disputes these averments.  He states that from the time he moved into C-

6    16, the toilet was cracked and a foul odor came from the toilet (Doc. 185, Ex. A, Skinner

7    Decl. ¶¶ 16, 18).  When the toilet was flushed, it would leak dirty wastewater from the

8    base onto the floor, including urine and fecal contaminated water (*id.* ¶¶ 20, 22, 30; Doc.

9    185, PSOF ¶¶ 14-15).  The toilet leaked incessantly and Skinner had to keep the lid down

10   to help manage the constant stench (Doc. 185, Ex. A, Skinner Decl. ¶¶ 9, 11, 24-26).

11   And when the toilet in the cell above Skinner's was flushed, water would drip into his

12   cell, adding to the flooding problem (*id.* ¶ 29).

13           Further, although the parties dispute whether Skinner was provided cleaning

14   supplies, he avers that despite his requests, he was not provided any cleaning supplies and

15   was forced to use a single rag to try to cope with the flooding problem (Doc. 185, Ex. A,

16   Pl. Decl. ¶¶ 9, 11, 24, 30-34, 73, 90, 96, 101, 106-107).

17           Taking Skinner's facts as true, a reasonable jury could find that confinement in a

18   cell with a toilet that leaked dirty wastewater onto the cell floor for approximately eight

19   months and that produced a constant stench, combined with the denial of cleaning

20   supplies, amounts to a sufficiently serious deprivation under the Eighth Amendment.  *See*

21   *Johnson*, 217 F.3d at 731; *Keenan*, 83 F.3d at 1090 (foul air with fumes of feces and

22   urine could undermine health and sanitation and establish an objectively serious

23   deprivation); *Anderson*, 45 F.3d at 1314; *Chatman v. Tyner*, 1:03-cv-6636-AWI-SMS

24   PC, 2009 WL 498958, at *9-10 (E.D. Cal. Feb. 26, 2009) (finding material issue of fact

25   whether the prisoner-plaintiff was subjected to unconstitutional conditions of

26   confinement where he was housed for 15 days without shoes in a cell with a leak from

27   the side of toilet that flooded the cell floor).  Thus, a question of fact exists as to the first

28   prong of the deliberate indifference analysis.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### b.      Browning Unit

With respect to the Skinner's confinement in the Browning Unit, Long avers that he never observed Skinner's cell to be dirty or in need of additional cleaning, and Alvarez states that he did not observe any conditions that constituted a risk of harm to Skinner's health or wellbeing (DSOF ¶¶ 243, 260).

According to Skinner, his first cell in the Browning Unit—cell 1-B-3—was filthy; one wall had several smears of what appeared to be blood; another wall had smears of what appeared to be feces; the floor was grimy, and the toilet was filthy (Doc. 185, Ex. A, Pl. Decl. ¶¶ 108, 110-113, 115-116).  He states that on his second day in the cell, he was given a short handled broom and mop; however, the mop was not effective on the wall (*id.* ¶ 126, 129).  Thereafter, he was provided only a toilet brush, until January 24, 2012, when CO II Fewel provided all necessary cleaning supplies (*id.* ¶¶ 132, 147, 154-155).  Then, on June 9, 2012, after his transfer to Able 51, feces and sewage water flooded the run and Skinner's cell (*id.* ¶¶ 191, 194-195).  By the time staff turned the water off, Skinner's cell was flooded, and he was denied a mop and disinfectant and directed to use his blanket to dry up the flooding (*id.* ¶¶ 199-201).  Skinner alleged that he did not receive any other cleaning supplies and he was not scheduled to receive a clean blanket until July 2012 (*id.* ¶¶ 203-204).

As stated, extreme deprivations are required to make out a conditions-of-confinement claim; therefore, Skinner must present facts showing that the alleged deprivation amounted to more than the "routine discomfort" that is "part of the penalty that criminal offenders pay for their offenses against society." *Hudson*, 503 U.S. at 9 (quoting *Rhodes*, 452 U.S. at 347).  With respect to cell 1-B-3, Skinner's allegations that the cell and toilet were filthy and the floor was grimy are too vague to establish that he was subject to *extreme* deprivations denying him the minimal civilized measure of life's necessities.  *See Celotex*, 477 U.S. at 324 (nonmovant must "go beyond the pleadings" and by its own evidence set forth "specific facts" showing a genuine issue for trial).  Skinner's allegations indicate that it was not even clear what the smears on the walls

were and, notably, his subjection to the conditions in cell 1-B-3 was not combined with a complete denial of cleaning supplies—he was provided a mop and broom within a day, and he does not claim that he lacked access to water.  Also, Skinner was provided all necessary cleaning supplies just over a month after his transfer to the cell.  Although Skinner alleges that proper cleaning supplies were not provided again after January 24, 2012, he does not present facts about the condition of his cell after that date (*see* Doc. 185, Ex. A, Pl. Decl. ¶¶ 149-188).

When considering the vague allegations regarding the condition of the 1-B-3, the fact that some cleaning supplies were provided immediately, and the limited duration of his exposure to the conditions in the cell, the Court finds that Skinner fails to establish that conditions in 1-B-3 were objectively, sufficiently serious to implicate the Eighth Amendment.

As to the conditions in Able 55, the record shows that the flooding that occurred on June 9, 2012, was an isolated incident.  Although Skinner was forced to use his blanket to clean his cell, he does not present facts showing whether he in fact had to wait until July for a clean blanket, nor does he indicate how long he had to wait for cleaning supplies (*see id.* ¶¶ 203-206).  Without more, these facts are insufficient to satisfy the objective component of the Eighth Amendment.

Accordingly, Court finds that there exists no genuine issue of material fact whether the conditions of confinement in the Browning Unit cells were sufficiently serious to rise to an Eighth Amendment violation.  Summary judgment on this portion of Skinner's claim will be granted, and those Defendants connected only to the Browning Unit allegations will be dismissed.[8]

//

//

---

[8] The Defendants associated only with the Browning Unit claim are Barrios; Heet; Long; Alvarez; Tillman; and Trianna.

1    **2.     Subjective Test**

2        As to Skinner's claim pertaining to conditions of confinement in C-16, the Court

3    proceeds to the second step in the deliberate indifference analysis, which addresses

4    whether any Defendant was aware of the risk to Skinner's health and safety posed by the

5    conditions but chose to disregard it.   *Farmer*, 511 U.S. at 834.   When analyzing a

6    defendant's liability for deliberate indifference, the inquiry "must be individualized and

7    focus on the duties and responsibilities of each individual defendant whose acts or

8    omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844

9    F.2d 628, 633 (9th Cir. 1988); *see Rizzo v. Goode*, 423 U.S. 362, 370-71, 375-77 (1976).

10   The Defendants associated with Skinner's C-16 claim are Ryan, Hetmer, Fizer, Kane,

11   Silves, Bohuszewicz, and Zaborsky.

12    **a.     Ryan**

13       In his Response to Interrogatories, Ryan states he is aware that because the Central

14   Unit is one of the older buildings in the prison system, its plumbing system requires more

15   attention than plumbing systems at newer prisons; however, he states he was not familiar

16   with the specific plumbing and toilet issues in Skinner's cell (Doc. 177, Ex. B, Resp. to

17   Interrog. No. 7 (Doc. 177-1 at 14)).   Nor was he familiar with the conditions of Skinner's

18   cell, the cleaning equipment that was available, or the cell cleaning schedule for

19   Skinner's unit (*id.*, Nos. 13, 15-16, 20, 23).

20       The evidence reflects that Skinner addressed three grievance documents to Ryan: a

21   March 18, 2012 appeal (Doc. 185, Ex. A, Ex. 16); an April 15, 2012 appeal (*id.*, Ex. 10);

22   and a July 29, 2012 Inmate Letter (*id.*, Ex. 13; Doc. 177, Ex. B, Resp. to Interrog. No. 2).

23   Ryan states that he does not personally investigate the facts in grievance appeals filed at

24   the Director's level, nor does he personally respond to them; rather, he delegates those

25   functions to subordinate staff who respond on his behalf (Doc. 177, Ex. B, Resp. to

26   Interrog. No. 14).   He further states that the July 29, 2012 Inmate Letter was received in

27   his office but was forwarded to Offender Operations for a response (*id.*, No. 2).   The

28   Court notes that all of these grievance documents were submitted well after Skinner's

1   December 2011 move out of the Central Unit and they primarily concern the lack of

2   cleaning supplies provided in the Browning Unit.

3         With this evidence, Defendants satisfy their initial burden to show the absence of a

4   genuine issue of material fact as to Ryan's knowledge of a substantial risk of harm.

5         In response, Skinner fails to introduce any evidence that Ryan was personally

6   aware that the conditions in C-16 posed an excessive risk to Skinner's health or safety.

7   He merely concludes that the "CB-3 defendants knew that the toilet was irreparable" and

8   "the prison officials involved in the CB-3 issues knew of the risks" (Doc. 184 at 12, 15).

9   These general claims are insufficient to support an inference that Ryan had the requisite

10   knowledge of a substantial risk of harm to Skinner's health; thus, Ryan cannot be liable

11   for deliberate indifference. *See Farmer*, 511 U.S. at 837; *see also Rizzo*, 423 U.S. at

12   371-72, 377 (to establish a § 1983 claim, the plaintiffs must demonstrate that they

13   suffered a specific injury as a result of specific conduct of a defendant and show an

14   affirmative link between the injury and the conduct of that defendant).

15         The Court therefore finds that Ryan is entitled to summary judgment on the

16   conditions-of-confinement claim related to C-16.

17               **b.**    **Hetmer**

18         Defendants' evidence shows that as a Warden, Hetmer is responsible for

19   supervising subordinate staff in the Complex, maintaining a budget, allocating manpower

20   and resources, and ensuring that policies are followed (DSOF ¶ 210).  Hetmer avers that

21   he generally does not have direct communications with inmates and would only become

22   aware of an inmate's complaint if the inmate writes directly to him or submits a

23   grievance appeal (*id.* ¶¶ 211-212).  Hetmer also avers that he had no knowledge of

24   Skinner's complaints and only learned of Skinner's issues via the grievance appeal

25   Skinner submitted on October 21, 2011 (*id.* ¶¶ 214-215).  Hetmer explains that because

26   he did not have knowledge of Skinner's plumbing or cleaning supplies issues, upon

27   receipt of the grievance appeal, he requested and reviewed the work orders submitted for

28   C-16 (Doc. 177, Ex. C, Hetmer Decl. ¶¶ 18-19).  And in his January 19, 2012 response to

Skinner's grievance appeal, Hetmer informed Skinner that he reviewed the issue and found that the Deputy Warden addressed Skinner's concerns in determining that the toilet could not be repaired and moving Skinner to a different cell (Doc. 185, Ex. A, Ex. 15 (Doc. 185-1 at 58)).  Hetmer further informed Skinner that cleaning schedules and inspections have been addressed, and he directed Skinner who to contact if there were further issues (*id*).

Skinner does not dispute Hetmer's statement that he only learned of Skinner's complaint after Skinner submitted his October 21, 2011 grievance appeal (PCSF ¶¶ 214-215).  Skinner asserts that at some unspecified time, Deputy Warden Kane told him that Hetmer already knew about the toilet problems throughout CB-3 (Doc. 185, Ex. A, Pl. Decl. ¶ 100); however, even if the Court considers this assertion, it does not show that Hetmer was aware of Skinner's cell conditions or the problem with the toilet in his cell.

In short, the record establishes that Hetmer was not aware of Skinner's conditions of confinement in C-16 until after Skinner was transferred out of the cell and no longer subject to the unsanitary conditions.  The evidence also shows that Hetmer responded to Skinner's complaint and investigated the issues raised in the grievance appeal and, even though Skinner was no longer confined in C-16, Hetmer took action to address cleaning protocols.

On this record, Hetmer did not have the requisite knowledge of a substantial risk of harm at the time Skinner was subject to the conditions in C-16 and, when he learned of the conditions in the cell, Hetmer responded reasonably.  As a result, Hetmer cannot be liable for deliberate indifference, and he will be granted summary judgment on this claim. *See Farmer*, 511 U.S. at 845 ("prison officials who act reasonably cannot be found liable under the [Eighth Amendment]").

### c.    Fizer

Fizer avers that he did not learn of Skinner's complaint about his cell conditions until receipt of Skinner's August 21, 2011 grievance (Doc. 177, Ex. D, Fizer Decl. ¶ 13; *see* DSOF ¶ 54).  In response to the grievance, Bohuszewicz was assigned to investigate

the toilet issue and prepare a draft response for Fizer, and it was determined the toilet could not be repaired or replaced at that time; thus, Skinner was moved to a new cell (Doc. 177, Ex. D, Fizer Decl. ¶¶ 16-18; Ex. H, Attach. 2 (Doc. 177-8 at 13)).

Skinner does not dispute that Fizer did not become of aware of his specific complaint until Fizer received the grievance (DSOF ¶ 177; PCSF ¶ 177).  Nor does Skinner dispute that Fizer responded to his complaint and removed him from C-16 (PCSF ¶¶ 178, 181-182).  Thus, Fizer responded reasonably and removed Skinner from the unsanitary cell and, like Hetmer, Fizer cannot be liable for deliberate indifference.  *See Farmer*, 511 U.S. at 845.

### d.   Kane

Kane indicates that he became of aware of Skinner's toilet and cell-conditions complaint when Skinner's August 21, 2011 grievance reached the Deputy Warden's level (DSOF ¶¶ 21, 77).  Kane avers that he read the CO III's Inmate Letter response stating that a work order was issued for Skinner's toilet and maintenance was notified of Skinner's complaint (Doc. 177, Ex. E, Kane Decl. ¶ 9).  But Kane states that he did not have any involvement in investigating or reviewing Skinner's grievance (*id.* ¶ 8)—a fact that Skinner does not dispute (DSOF ¶ 134; PCSF ¶ 134).

Skinner merely avers that at unspecified times, he showed the toilet problems to Kane and Kane said he was aware of the irreparable toilet problems throughout CB-3 (Doc. 185, Ex. A, Pl. Decl. ¶¶ 95, 100).  This is insufficient to show that Kane was deliberately indifferent to a risk to Skinner's health or safety.  Even though Kane learned of Skinner's grievance, the investigation into the complaint was supervised by Fizer, to whom Kane reported; thus, action was being taken to address the situation, and Skinner was subsequently moved out of the cell (Doc. 177, Ex. E, Kane Decl. ¶ 6).

The Court finds that there is insufficient evidence to raise a question of fact regarding Kane's liability for deliberate indifference; thus, he is entitled to summary judgment.

1

### e.    Silves

2      Silves explains that as a Sergeant, her duties included overseeing staff functions

3 and daily operations of CB-3, conducting daily walks of assigned areas, and addressing

4 complaints, including sanitation complaints, that were brought to her attention (Doc. 177,

5 Ex. F, Silves Decl. ¶¶ 5, 10).  Her job also required her to review all work orders with

6 end-of-shift reports and make sure they were assigned a tracking number and placed in

7 the box for unit maintenance personnel (*id.* ¶ 17).  Silves avers that she was aware that

8 many toilets developed leaks but that they were addressed as quickly as possible by

9 maintenance (*id.* ¶¶ 19-20).[9]

10     Skinner asserts that at unspecified times, he showed Silves the toilet problems and

11 asked for cleaning supplies; that she told him she knew about the problems but had other

12 work to do; and that when he saw her again, he tried to address the problem with her

13 "which only irritated her" (Doc. 185, Ex. A, Pl. Decl. ¶¶ 95-98).  Skinner avers that not

14 once did Silves provide him with any means to address the sanitation and plumbing

15 problems during her walks (*id.* ¶ 101).

16     Although Silves conducted daily walks through CB-3, which would suggest she

17 would have been aware of the conditions in Skinner's cell, he avers that he kept the toilet

18 lid down to manage the stench and that contaminated water leaked out of the cell when he

19 flushed the toilet (*id.* ¶¶ 25, 27-28).  Thus, if Silves walked by when Skinner had not just

20 used the toilet, it is not evident that she would have been fully aware of the extent of the

21 toilet problem.  Further, Skinner identifies just two occasions—dates unknown—that he

22 tried to address the toilet problem with her (*id.* ¶¶ 96-98).  On these limited facts, Skinner

23

24

---

25     [9] Silves also avers that she does not recall Skinner specifically, does not she recall
26 Skinner's cell, and does not recall observing any conditions of confinement that posed a
serious risk to Skinner's health (Doc. 177, Ex. F, Silves Decl. ¶¶ 23, 26).  A failure to
27 remember factual information, like having a "belief" in factual information, is
insufficient because it does not show personal knowledge.  *See Bank Melli Iran v.*
28 *Pahlavi*, 58 F.3d 1406, 1412-13 (9th Cir. 1995) (declaration on information and belief are
entitled to no weight where declarant lacks personal knowledge).

1  fails to establish that Silves had the requisite knowledge of a substantial risk of harm to

2  his health.

3          Even assuming there exists a question of fact as to Silves's knowledge of the risk

4  of harm, Skinner fails to show that she acted with deliberate indifference in response to

5  the risk.  That Silves did not provide cleaning supplies on two occasions, and that she was

6  irritated on one occasion, does not satisfy the high standard set by the Eighth

7  Amendment—a standard of criminal recklessness.  *Farmer*, 511 U.S. at 837, 839.  Mere

8  negligence or unprofessional conduct on the part of a prison official is insufficient to

9  establish liability; rather, the official's conduct must have been wanton.  *Id.* at 834-35

10 ("liability requires more than ordinary lack of due care for the prisoner's interests or

11 safety") (internal quotation omitted).  Moreover, the evidence demonstrates that Silves

12 reviewed all of the work orders daily, and the record shows that from March-October

13 2011, there were at least seven work orders submitted for water and toilet issues in C-16

14 (Doc. 177, Ex. C, Hetmer Decl. ¶ 19).  Silves was therefore aware that work orders were

15 submitted to maintenance to repair the problems reported in C-16.

16         On this record, the Court finds the absence of a genuine issue of material fact

17 regarding Silves's liability for deliberate indifference, and she is entitled to summary

18 judgment.

19                          **f.    Bohuszewicz**

20         Bohuszewicz avers that as Grievance Coordinator, she walked through CB-3

21 approximately once weekly to answer inmate questions and follow-up on items related to

22 inmate grievances (Doc. 177, Ex. H, Bohuszewicz Decl. ¶¶ 20-21).  She states that she

23 received Skinner's August 21, 2011 grievance that complained about the conditions of

24 his cell and, in response, she checked with the maintenance staff to ensure they were

25 aware of Skinner's complaint and consulted with the Deputy Warden and, after her

26 investigation, it was determined that the toilet could not be repaired or replaced at that

27 time (*id.* ¶¶ 9, 11).  Bohuszewicz then prepared a draft grievance response for the Deputy

28

Warden, which was dated October 19, 2011—the same day Skinner was moved out of C-16 (*id.* ¶ 13).

Skinner avers that he showed Bohuszewicz the toilet problems but he does not indicate exactly when he did so nor does he state how many communications he had with her (*see* Doc. 185, Ex. A, Pl. Decl. ¶¶ 95-96, 99).   As such, he fails to establish that Bohuszewicz was aware of a substantial risk of harm prior to her receipt of the August 21, 2011 grievance.

Further, Skinner describes a single communication with Bohuszewicz at an unspecified time; when he asked her for cleaning supplies, she responded that ADC was aware of the plumbing issues and that ADC was broke (Doc. 185, Ex. A, Pl. Decl. ¶¶ 95-96, 99).   This response, standing alone, does not rise to deliberate indifference.   *See Farmer*, 511 U.S. at 834-35.   Moreover, Bohuszewicz's conduct after receipt of Skinner's grievance reflects that she responded to the issue and acted reasonably; indeed, her investigation and draft response ultimately led to Skinner's transfer out of C-16.   The Court therefore finds that Bohuszewicz cannot be liable for deliberate indifference, and summary judgment will be granted as to her.

### g.   Zaborsky

Zaborsky explains that as a CO IV, she was responsible for overseeing program staff that consisted of nine CO IIIs; she reviewed grievance actions; and she toured cell blocks several times a week (Doc. 177, Ex. G, Zaborsky Decl. ¶¶ 4-5).   According to Skinner, Zaborsky toured the cell block in mid-to-late March 2011, at which time he stopped her and showed her how his toilet was leaking, stated that he was missing the entire hot-water plumbing apparatus, and explained that he needed adequate sanitation supplies (Doc. 185, Ex. A, Pl. Decl. ¶¶ 88-91).   Skinner avers that Zaborsky asked him to spell the word "apparatus," which he did, and then she walked away (*id* ¶¶ 92-93).   Within a week or two, the sink was repaired; however, no repair work was done on the toilet (*id.* ¶ 94).   Skinner does not describe any other communication or contact with Zaborsky.

On this limited record, it is not clear whether this single contact with Zaborsky was sufficient to put her on notice of the extent of the toilet problem and resulting conditions in Skinner's cell such that she was aware of a substantial risk of harm to his health. Even so, her failure to provide cleaning supplies after this single interaction and her conduct towards Skinner amount, at most, to negligence and inappropriate behavior but do not rise to the "subjective recklessness" standard required under the Eighth Amendment. *See Farmer*, 511 U.S. at 839. Consequently, no material factual dispute exists as to Zaborsky's liability for deliberate indifference, and she is entitled to summary judgment.

In light of the above, the Court will grant Defendants' Motion for Summary Judgment, and it need not address the parties' arguments regarding funding.[10]

**IT IS ORDERED**:

(1)     The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 176).

(2)     Defendants' Motion for Summary Judgment (Doc. 176) is **granted**.

(3)     Ryan, Silves, Fizer, Hetmer, Kane, Triana, Heet, Tillman, Bohuszewicz, Long, Barrios, Zaborsky, and Alvaraz are dismissed as Defendants.

//

//

//

---

[10] In their reply, Defendants request that the Court dismiss this case in its entirety and sanction Skinner "for abusing grievance and litigation processes to pursue his litigious and monetary whimsy" (Doc. 188 at 8). Defendants' request is wholly inappropriate and will be denied. A request for sanctions in the reply brief is procedurally improper because it does not provide the other party with notice and opportunity to respond. *See United States v. Wright*, 215 F.3d 1020, 1030 n. 3 (9th Cir. 2000) (declining to consider an argument raised for the first time in reply brief); *see also* Fed. R. Civ. P. 11(c)(2) (motion for sanctions must be made separately from any other motion). More importantly, the record shows that Skinner did not abuse the grievance or litigation processes; rather, he properly exhausted his administrative remedies and then filed a civil rights complaint and sufficiently stated constitutional claims against Defendants (*see* Doc. 9). *See supra*. Finally, the case proceeds against Defendant Duarte.

1        (4)    The remaining claim is Skinner's Eighth Amendment conditions-of-

2    confinement claim against Duarte.

3        DATED this 22nd day of June, 2015.

4

5

6

7                                                                                             _____

8                                                      Honorable Stephen M. McNamee
                                                  Senior United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28